HORNET, The (BOON v.). See Case No. 1,-640.

HORNIBROOK (UNITED STATES v.). See Case No. 15,390.

HORNUM PATENT MANUF'G CO. v. BROOKLYN CITY R. CO. See Case No. 6.703.

HORR (BAUENDAHL v.). See Case No. 1,-113.

HORRELL (UNITED STATES v.). See Case No. 15,391.

___

## Case No. 6,706.
### The HORTENSIA.
[2 Hask. 141.] [1]

District Court, D. Maine. Jan., 1877.

COLLISION—FAULT—EVIDENCE—WITNESS.

1. A vessel sailing close-hauled, upon being overtaken by another sailing the same course slightly to windward, is at fault by luffing so as to cause collision.

2. The overtaking vessel must keep clear; but has a right to assume that the forward vessel will hold her course.

3. The rule, that the testimony of those on a vessel should prevail as to what takes place on board her, does not obtain in all cases.
[See The Hope, 4 Fed. 89.]

4. The interest of witnesses in the result of the cause should be considered in judging of the value of their testimony.

In admiralty. Libel by the owners, officers, crew and underwriters of the schoon-

1 [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

er Equal, against the Hortensia for collision, whereby the former and her cargo and the effects of the officers and crew were lost. The cause was heard upon libel, claim, answer and proof.

Almon A. Strout and John C. Dodge, for libellants.

George Walker and Bion Bradbury, for claimants.

FOX, District Judge. This libel was instituted in behalf of the owners, officers and crew of the schooner Equal of Rockland, and of the insurers of her cargo, to recover damages sustained in a collision with the Hortensia on the night of November 27th, at 7.30 p. m., off Cape Cod, in which the Equal was sunk and her master lost.

The Equal was a small schooner of about fifty tons; was from New York bound for Winterport with a full cargo of corn, having on board three men, master, mate and a third, who acted as cook and seaman. At the time of the collision she was on the port tack, close-hauled, about six miles from the shore of the cape beyond Nauset, and was making for Thatcher's Island. The wind is said by those from the Equal to have been about west by north, a wholesail breeze, the night somewhat hazy, and a choppy sea; but it was light, as there was nearly a full moon shining, and a vessel could have been seen a mile distant.

The Hortensia is a schooner of one hundred and seventy-eight tons, with a crew of six men, was bound from Hoboken to Boston with coal, and is owned in Boston and Machias in this district. She was astern of the Equal, close-hauled on the port tack.

The answer admits that the collision occurred at the time and place described in the libel, and alleges that the night was somewhat hazy, and denies that it was so light that a vessel could be seen a mile distant, or that the moon was shining brightly. It alleges that the wind was west by south. In this respect there is a difference of only two points in the statement of the parties; but this is immaterial, as it is conceded that both vessels just previous to the collision were on their port tack, close hauled and within five points.

Some matters are admitted by both parties —such as the locality; the state of the wind and sea; the course of each vessel; and that the Equal with her master was lost. The attention of the court, therefore, will be confined to the matters in controversy, and to the evidence bearing thereon.

As to the darkness of the night, from the whole testimony, I conclude that it was somewhat hazy with the moon at times obscured by clouds, but that one vessel could have been seen from the other at the distance of half a mile, and their regulation lights for more than double that distance.

Each vessel had proper lights and competent lookouts forward; both were sufficiently

manned; all on board the Equal were on deck with the master at the wheel. She was sailing about four, and the Hortensia about six knots an hour; and each vessel was seen from the other when they were at least half a mile distant.

The libel alleges that when the Hortensia was first seen from the Equal, she was a long distance astern of the Equal, but pursuing the same course and following directly after; that the Equal had her four lower sails set, but the wind being fresh, the master, desiring to take in some sail, luffed her up a little into the wind, but not enough to shake the wind out of her sails; that the Hortensia was sailing faster than the Equal and gaining upon her, and at the time the Equal luffed as above stated, the Hortensia was a long distance behind her, and having a proper lookout might easily have seen and avoided her by passing on either side of her, but that instead of so doing, although the master and crew of the Equal repeatedly shouted to those on board of the Hortensia, directing them to keep off, she came straight on, first luffing somewhat, and then, falling off a little from the wind as she approached the Equal, struck the Equal on her port quarter, cutting into her so that she filled and sank with her cargo; that there was no proper lookout on the Hortensia, and that she sailed away without attempting to render any assistance to save the master.

The answer sets forth that the Equal was to the leeward of the Hortensia and astern a short distance from the Equal and sailing faster, and that when the Hortensia came near the Equal, expecting to pass her to windward, as she might have done with safety, provided the Equal had not changed her course suddenly and without warning to those on board the Hortensia or hailing them in any way, the person at the wheel of the Equal luffed her up into the wind so as to shake the wind out of her sails whereby her course was changed, and ranging ahead, she came into the course the Hortensia was sailing; that as soon as the Equal began to come up into the wind, the lookout on the Hortensia shouted to the master that the Equal was changing her course and coming into the wind, whereupon the master of the Hortensia ordered the wheel to be put hard to port, and to cast off the main-sheet so that the Hortensia could pass the Equal to leeward, which order was immediately executed; that the Hortensia did not luff as alleged by the libellants, but immediately fell off; yet, notwithstanding every exertion made by those on board the Hortensia to avoid the collision, the Hortensia struck the Equal on the port quarter without any fault or neglect of those sailing the Hortensia, carrying away under her bow the mainmast, mainsail and main-boom of the Equal; and that so soon as these could be cleared away and the vessel controlled,

the Hortensia tacked and made search for the Equal and her master; that there was a good lookout on the Hortensia; that all hands but one were on deck; and that they had no notice from the Equal, or reason to believe that she intended to change her course.

Rules 22 and 23 for preventing collisions are applicable to and must control the decision of this cause. These rules declare that every vessel overtaking any other vessel shall keep out of the way of the last mentioned vessel, and the latter vessel shall keep her course, due regard being had to all dangers of navigation and to any special circumstances which may exist in any particular case rendering a departure from the rules necessary in order to avoid immediate danger. Nothing in the present case is in evidence to justify a departure from these rules.

The charges made by the libel against the Hortensia are that she failed to discover the Equal for want of a proper lookout, that she luffed only a point when she was a long distance ahead, and that there was ample time and space for the Hortensia to have passed on either side of the Equal, but that she first luffed and then fell off and run into and sunk the Equal.

The answer alleges that the Hortensia being near to, but astern and to windward of the Equal, and far enough to have passed by to the windward in safety if the Equal had held her course, the Equal luffed so that she came up into the wind, and was head to the wind with the wind out of her sails; that as soon as this was done, it was seen by the lookout of the Hortensia, and the master was informed of it; that the wheel was at once put to port and the main-sheet cast off that she might go to leeward of the Equal; and that all was done that could be, but without success.

As the libel admits that the Equal changed her course somewhat in violation of her duty to the ship astern, the burden is upon the Equal to satisfy the court as to the extent of such change, and whether it occasioned the collision.

Upon this branch of the case, as to how great was the change of the Equal's course, there is the usual conflict of testimony from those on board the two vessels, and their testimony is utterly irreconcilable on this point. The witnesses were all examined in the presence of the court, were all residents in the eastern portion of this district, most of them were of more than the usual intelligence of persons in their positions, and there was nothing in the conduct and appearance of any of them which, of itself, would lead the court to distrust their statements.

Rowell, the mate of the Equal, was only nineteen years of age and had held that position but six weeks. He was on the lookout, and says the Hortensia was a mile distant

when he first saw her astern, slightly to windward; that the captain directed him and Bennett to lower the flying-jib, the deck being buried up in water; that finding they could not accomplish it, he told the captain to luff, so he could get it down; that the hanks caught and they got it only about halfway down when the captain of the Equal called out to the Hortensia to luff; that he ran aft and "all of us cried out so," but there was no reply from the Hortensia; she was then three hundred yards astern; the wind was not out of the Equal's sails, and she had not luffed more than a point at the time of the collision. This statement is sustained in all respects by the testimony of Bennett, who says the Equal came up a point, not more.

The testimony of the master of the Hortensia is that he first saw the Equal about twenty minutes after seven, about half a point on his lee bow, and as he should judge, about two hundred and fifty feet in advance, when she began to luff; that Averill, the lookout, was at the time on the forecastle deck, and sung out that the Equal was coming into the wind; that he then gave orders to put the helm hard up and let go the main-sheet, in order to go to leeward of the Equal; that he assisted the man at the wheel, but that, although all was done in this respect that could be, the Hortensia struck the Equal a square blow about ten feet from the stern on her port quarter; that while at the wheel he saw the jib and foresail of the Equal out by the port bow, her sails shaking, she lying about head to the wind, within two points, having first seen her on the lee bow about a hundred feet to leeward under the fore-boom.

Averill, the lookout, confirms the statements of the master, and says he kept the Equal in view from the time he first saw her until she luffed, and that as soon as she luffed he informed the captain who gave his orders as stated; that he, Averill, let go the main-sheet; that the Equal was in the wind with her sails shaking, and that before the vessel struck, he saw the Equal off their weather quarter, her bow and jib-boom, and that the Hortensia's course was not changed until after the Equal had luffed.

Joseph Proctor was at the wheel of the Hortensia and corroborates the master's statements, and says that he saw the Equal's jib to windward of their mainmast before the collision, and that the Hortensia held her course until the Equal luffed up under her bows.

Holmes, the mate of the Hortensia, says that he was in his berth, heard the captain's orders and went on deck to let go the main-sheet; found it was off and unrove; then saw that the Equal was hard to the wind; could see her jib and foresail; wind was out of her sails; first saw her on the port bow.

F. O. Larrabee, the steward, testifies that he was on deck and first saw the Equal about half a mile ahead on their lee bow; that their lookout afterwards cried out, she was luffing, and that the captain gave his orders as is before stated; that he afterwards saw the Equal luffing. "She was head to the wind at the time we struck, and the wind was out of her sails."

The testimony of the two men from the Equal is directly opposed on this point by that of the five men from the Hortensia, all of whom swear that, instead of the Equal luffing a single point, she was, in fact, head to the wind, and her sails were shaking before the collision.

It is urged that those on the Equal had the best opportunity of knowing what took place on board of her at that time, and therefore their testimony is the more reliable. This rule has frequently been adopted by courts of admiralty, and I cannot but believe that sometimes it has not been without its effect on the statements of witnesses, inducing them to think that a falsehood persistently reiterated by all on board a ship, as to what happened thereon, will outweigh the testimony of those from the other ship, even if it should be sustained by facts and circumstances about which there can be no question.

In the present case, the five witnesses from the Hortensia swear, not to opinions, but to facts: to wit, to the position of the sails of the Equal as they were actually seen by them previous to the collision, that they were then visible on the port side of of the Hortensia, loose and without wind, and that she was heading up to the wind; I am aware of no reason why the testimony of these five men on this point should be discredited, and reliance placed upon that of the two men from the other vessel.

In determining what evidence should be given to the crews of the respective vessels, it will perhaps aid us, if we recall some circumstances presented in the case, about which there can be but little controversy.

I. The libel is instituted as well in behalf of the crew of the Equal as of the other parties. They are, therefore, parties to this controversy, having a direct interest in the matter, claiming to recover from the Hortensia the value of their clothing, &c., lost by the collision. The amount claimed, fifty dollars, is but small, but to them it is undoubtedly of considerable consequence, from their appearance, probably their all. Experience is daily teaching us how slight dependence can be placed in similar cases upon this class of witnesses, and if by the decree, they are to gain even a small amount, it is a circumstance which the court cannot but consider in coming to a conclusion as to the degree of credit which should be reposed in them.

II. The principal purpose to be accomplished by the luffing of the Equal and the lowering of the outer jib was to relieve her

decks from the water by bringing her up on an even keel, so that it would be discharged through the scuppers. She was deeply loaded within 1½ streaks of the sea, and it is quite apparent that luffing a single point would not have speedily accomplished the contemplated purpose. The jib could not be got down, nor would the scuppers have risen above the sea, unless she had changed her course very much more than she did, either by luffing pretty fully into the wind, or running off before it. If the master attempted to accomplish this purpose, we cannot believe but that he would be likely to do all that was necessary therefor, and therefore, that she must have come up very much beyond a single point as stated by these witnesses. It may be said that he had not luffed up enough to allow the jib to run down. It is true, it did not come but part way, but these men say that they were about it four or five minutes, and they ascribe the trouble to the hanks catching, which might have been the case, even if she was head to the wind.

III. It is not questioned that the course of the Hortensia was changed after the luffing of the Equal was discovered by the lookout, the vessels being then more than two hundred and fifty feet apart, as I think, with the Hortensia a little to the windward. In my view, at that distance, in that position, and in such a night, it would have been impossible for the lookout of the Hortensia to have discovered the change in the course of the Equal, if it did not exceed a single point, her sails being full and not shaking, and she making headway. A greater deviation from her former course, which was substantially on a parallel line with the Hortensia, was requisite for a lookout to have detected it.

IV. Some aid may be gained from the character of the blow received by the Equal. Those on board the Hortensia represent it as having been nearly at right angles, but the men from the Equal describe it as much more acute. The learned counsel for the libellants understood the models to be placed on the compass card by them as at an angle of about forty-five degrees, as I gather from his remarks. My own impression is that they approximated somewhat nearer to the right angle; but if the blow was in that direction, the Equal must have luffed more than a point for the vessels to have thus come in contact, as the mate of the Equal says the Hortensia's course was changed only one point.

V. There is another matter testified to by the two men from the Equal about which there could certainly be no mistake, and in relation to which, I regret to believe that they have designedly testified to a falsehood. At the time of the collision, the master of the Equal continued on board of her, and it is conceded by the crew of both vessels that he cried out to those on board the Hortensia in the most persuasive language for relief, and that his appeals were heard by those on board that vessel. These two vessels were together but for an instant, and both of the men from the Equal swear that after they had separated they asked the captain of the Hortensia to lower his boat and return in search of their captain, but that he declined and continued on his course for an hour and a half, and then tacked ship and stood back for the place of the disaster. The master of the Hortensia denies that any such appeal was made to him. He admits that he heard the cry of the master of the Equal for assistance, and he and every other witness from the Hortensia swear that at this time the bow of the Hortensia was fouled up with the wrecked stuff from the Equal, and that as soon as it could be done, it was cut adrift, which did not exceed ten minutes, and the vessel was then put about and search for the Equal and her master was made by them for more than an hour and a half, cruising around as near as they could judge in the vicinity of the disaster until, as is testified, one of the crew of the Equal gave up all hope and advised the master of the Hortensia to resume her course. The master of the Hortensia swears that, by acting as he did, he saved time, and that he believed, by so doing, he could return to the Equal sooner than if the boat had been cleared and lowered in the darkness; that a boat could not have reached the Equal in the darkness, if she was afloat, so soon as the schooner could; and all who have been examined from the Hortensia testify that, instead of its being an hour and a half that the Hortensia continued on her course, it did not exceed ten minutes before she had tacked and was returning towards the Equal.

The court cannot believe that a Maine shipmaster would thus deliberately sail away and abandon to certain death an unfortunate fellow-being appealing to him in God's name to aid him as his vessel was sinking; and if one should ever be found so destitute of humanity as to attempt it, I trust that his crew will so manifest their horror of his barbarity as to at once induce him to a different line of conduct, and compel him to render the required aid. It is intimated that the master of the Hortensia, having destroyed the Equal, was not unwilling that the testimony of her master might perish with his vessel; but the court can not yield to the suggestion, and can not believe that a master can be found so devoid of every spark of humanity, but is the rather of opinion that the two witnesses from the Equal are so reckless in their testimony that it is not safe to rely upon their statements, either in this behalf, or in the other matters where they are in direct conflict with five other witnesses.

VI. It is claimed that the cause of the collision was the proximity of the Hortensia, and that if both vessels had kept their

course, the collision would have been unavoidable. The first reply to this suggestion is, that this ground is altogether inconsistent with the libel, which alleges that the Hortensia was a long distance behind the Equal, and having a proper lookout might easily have seen and avoided her by passing on either side of her at the time the master undertook to take in the jib. The witnesses from the Equal give the distance of the two vessels from each other at this time as three hundred yards.

It must be conceded that this objection finds some support in the answer and the testimony of those from the Hortensia, the answer alleging "that the Equal was to leeward of the Hortensia, which was a short distance astern." The witnesses in defense all substantially agree in the statement that, when they first saw the Equal, she was something to leeward, a number describing it as about half a point in their judgment, and giving the Hortensia as from one hundred and fifty to two hundred and fifty feet astern; some calculations have been made by the learned counsel for the Equal to demonstrate that under these conditions the Hortensia must have struck the Equal astern, if both vessels had kept their course; but it must be remembered that these distances and courses are matters of opinion, while those on board the Equal say she was three hundred yards ahead when she began to luff; and the witnesses from the Hortensia also state that, their vessel at the same time, was more than one hundred feet to windward of the Equal, and if the two vessels had held their course, the Hortensia would have passed more than one hundred feet to windward of her. This statement, therefore, is to be kept in mind in determining whether the Hortensia was sailing dangerously near to the Equal if each had complied with the rule of the road. Moreover, the mate of the Equal, in response to an inquiry by the court, stated that he thought if the Equal had held her course, the Hortensia would have passed the Equal quite close, within three to five yards.

I am therefore of opinion that the Equal was in fault, luffing as she did, and that the Hortensia would have passed her in safety if she had not changed her course. Under the rules, I think the Hortensia had the right to approach near to the Equal if the master saw fit, but charged all the time with the responsibility of avoiding a collision by overtaking her if she complied with the requirements of the law, and that she had a right to presume its rules would be obeyed and to regulate her own movements accordingly. In my view, if the Equal had not violated her duty, but had kept her course, the Hortensia, having discovered her seasonably, could have gone either side of her as the master of the Hortensia might have deemed it expedient.

VII. It is urged, these proceedings on the part of the Equal were necessary to relieve her decks from water; but it is not made to appear that at that precise moment there was any urgency for this being done. The water had been over her deck for some time, and if the Equal had held her course for five or six minutes longer, the Hortensia would have passed her without difficulty; or if a necessity existed for immediate action, the Equal could have gone off before the wind, and thus on an even keel allowed the water to pass off.

VIII. It is said, the forward vessel is under no obligations to notify a vessel astern of her presence, or of her intended change of movements, or to pay any regard to her. I agree that there is nothing to be found in the regulations prescribed by congress on this subject; and I do not think that the exhibition of a light from the stern of the forward vessel is ordinarily requisite, or that perhaps it could be sustained under ordinary circumstances, as it might tend to deceive other vessels; but I can not admit that the ship ahead is justified in throwing herself directly under the bow of the hinder vessel without notice, or any precaution to discover and guard herself against the danger to which she is thereby subjected. Where there is apparent danger, a necessity arises to do the best we can for our safety; and a ship ahead, if the danger is apparent, should look out for the ship behind her. The City of Brooklyn, 1 Prob. Div. 276.

In our conduct, both on land and at sea, we are all bound to the exercise of prudence in our actions, and until I am differently instructed, I must hold that the conduct of the Equal, as I find it to have been, was without excuse or justification, and that the Hortensia is not to be held chargeable for this unfortunate disaster. Libel dismissed with costs.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

certified the question to the court, with his opinion, as follows: The assignee objects to the proof of the debt of the claimant, Aaron D. Hopping, on the ground of a preference, fraudulent under the bankruptcy act. On the 20th day of December, 1869, the bankrupts, copartners in trade under the name and firm of Horton, Hopping & Company, being unable to pay their debts in full, made a general assignment for the benefit of creditors, appointing and making the claimant their assignee. The claimant accepted the trust, and entered upon the duties of assignee under the assignment. The assignment did not make any preferences, but proposed the equal distribution of the property of the debtors pro rata among their creditors. The petition to have the debtors adjudicated bankrupts was filed within six months after the assignment. The assignment was made by the debtors with the intent, by that disposition of their property, to defeat or delay the operation of the bankruptcy act. Aaron D. Hopping, the person receiving the assignment and conveyance, had reasonable cause to believe that a fraud on the bankruptcy act was intended, and that the debtors were insolvent. The 39th section of the bankruptcy act declares that any person, &c., who, being bankrupt or insolvent, or in contemplation of bankruptcy or insolvency, shall make any payment, gift, grant, sale, conveyance or transfer, of money, or other property, estate, rights or, credits, with intent to give a preference to one or more of his creditors, or with the intent, by such disposition of his property, to defeat or delay the operation of the act, shall be deemed to have committed an act of bankruptcy, and shall be adjudged a bankrupt on the petition of one or more of his creditors, provided such petition is brought within six months after the act of bankruptcy shall have been committed; and, if such person shall be adjudged a bankrupt, the assignee may recover back the money or other property so paid, conveyed, sold, assigned or transferred contrary to the act, provided the person receiving such payment or conveyance has reasonable cause to believe that a fraud on the act was intended, and that the debtor was insolvent, and such creditor shall not be allowed to prove his debt in bankruptcy. The creditor contemplated by the last clause is a creditor who has received a payment or conveyance, giving him a preference. If the assignment in the present case had been made to a stranger, it would not have affected the claimant's right to prove his debt. He would have stood on an equality with all the other creditors of the debtors. The assignment did not give him any preference. Under the assignment he stood on an equality with the other creditors. For the administration of the trust, he might be entitled to commissions, but commissions are only wages earned for services rendered. A preference, within the meaning of the act, is an advantage in the payment of the debt due to him, acquired by one creditor over the other creditors of the debtor. The creditor appointed an assignee by a voluntary assignment of the debtor's property, for equal distribution pro rata among all the creditors of the debtor, has the administration of the trust committed to him, but he administers the trust under the eye of the creditors, and the law will not acknowledge that, in executing such an assignment, the creditor-assignee acquires any advantage over his fellow-creditors. A provision which would forfeit the debt in such a case, where a creditor was appointed assignee, could easily be evaded by making a person not a creditor, but in the interest of a particular creditor, the assignee. It is not to be regarded as the intent or policy of the law to promote such a result. There not being a preference in the present case, the creditor has not forfeited his right to prove the debt due to him by the bankrupts, against their estate in bankruptcy.

